[Civ. No. 12358. Third Dist. Jan. 21, 1972.]

JOHN M. KING, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

## Counsel

Lenard S. Zipperian and Wm. P. Roscoe III for Plaintiff and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Ernest P. Goodman, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, for Defendant and Appellant.

## Opinion

**FRIEDMAN, Acting P. J.**—This appeal involves the application of the Sales and Use Tax Law[1] to a contractor's gross receipts for constructing an electrical power transmission line.

The retail sales tax is measured by the gross receipts from the retail sale of tangible personal property. (§ 6051.) ■ Effective in 1965,

---

[1]Revenue and Taxation Code, section 6001 et seq. All statutory references in this opinion are to the Revenue and Taxation Code unless otherwise noted.

the Legislature adopted a provision declaring that telephone and electrical transmission lines, poles and towers are not "tangible personal property" for sales tax purposes. (§ 6016.5.) It accompanied its declaration with a statement that it was prospective only, leaving prior law unaffected. (Stats. 1965, ch. 1960, § 3.) The prior law had never been delineated by statute or judicial decision. The State Board of Equalization views the 1965 amendment as a legislative confirmation of its long-standing administrative practice, a practice which had classed such installations as tangible personal property for the purpose of the sales tax. When the Legislature stamped its action as prospective only, it manifested a "hands off" attitude. It neither confirmed nor rejected the past, but relegated pending uncertainties to judicial clarification. This decision will relate only to sales tax liabilities antedating the operative date of section 6016.5.

■ The facts are stipulated and permit brief summarization: In 1959 plaintiff John M. King was awarded a contract by the City and County of San Francisco calling for the construction of electrical transmission lines in Tuolumne and Mariposa counties. The city was to supply the steel towers, which the contractor would then install on heavy concrete foundations prepared by him. The contractor would supply the electrical conductor (i.e., cable or wire), insulators and other hardware, would unroll the conductor from the spools, string it on the towers and fasten it with insulators and hardware. The job was finished in April 1960.

After auditing King's books, the State Board of Equalization assessed a sales tax measured by two kinds of gross receipts: (a) $132,906 attributed to electrical conductors, insulators and hardware; (b) $378,139 for labor in erecting and fastening the lines on the towers. The board also assessed interest and penalties. It ruled that no tax was payable on the contractor's gross receipts for preparation of the concrete foundations or for installing the towers on these foundations.

King paid the principal amount of the tax under protest and refused to pay the interest and penalty. He sued for a refund. The trial court sustained that portion of the tax measured by the tangible components (wire, insulators, hardware) but held the tax inapplicable to that part of the contract price attributed to labor. The court held the contractor liable for interest on the reduced amount of the tax and sustained the penalty assessment. Both the taxpayer and the board appeal.

One provision of the sales tax law (§ 6006) defines "sale" to include the fabrication of tangible personal property for a consumer who furnishes

the materials. Another, section 6012, defines "gross receipts" as excluding the cost of labor in installing the property sold.[2]

The parties describe the issue as one pivoting upon the electrical transmission line's legal character as personal property or real property. The board characterizes it as tangible personal property, contending that section 6006, subdivision (b), demands inclusion in the tax base of the gross receipts attributable to "fabrication labor." The taxpayer does not deny his liability for the tax on the tangible materials, but argues that a power line is real property or an improvement to real property; hence that labor costs are exempted as "installation labor" under section 6012.

The board states that its administrative practice since 1936 has been to apply the sales tax to contracts for the erection of electrical lines and telephone lines. It relies upon a 1936 opinion of the Attorney General (No. 10585) advising that electrical and telephone transmission lines were to be assessed as personal property for ad valorem tax purposes. The Attorney General's 1936 opinion was not aimed at sales taxation and entered into no discussion or interpretation of the sales tax law. It was based upon a judicial interpretation of former section 3617 of the former Political Code, a provision which expressly excluded telephone and telegraph lines (but not electrical lines) from the category of "improvements" to real property. The current statutory counterpart is Revenue and Taxation Code section 105.

Like many tax statutes, the sales tax law employs relatively artificial, relatively self-contained, concepts. If it utilizes popular meaning or concepts

---

[2]Section 6006 provides in part:
" 'Sale' means and includes: (a) Any transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. 'Transfer of possession,' includes only transactions found by the board to be in lieu of a transfer of title, exchange, or barter. (b) The producing, fabricating, processing, printing, or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing, or imprinting."
In pertinent part section 6012 provides:
" 'Gross receipts' mean the total amount of the sale or lease or rental price, as the case may be, of the retail sales of retailers, valued in money, whether received in money or otherwise, without any deduction on account of any of the following:
"(b) The cost of the materials used, labor or service cost, interest paid, losses, or any other expense.
" 'Gross receipts' do not include any of the following:
"(c) The price received for labor or services used in installing or applying the property sold."

from other fields of law, it does so only by force of its own objectives and definitions. It does not define real property or "improvements" to real property, if only because it makes little use of these terms. Its definition of tangible personal property deals with tangibility, not with distinctions between personalty and realty.[3] To pursue the will-o'-the-wisp of definitions, concepts and distinctions from other areas of law—where they are shaped by purposes and by social and economic factors unrelated to sales taxation—leads to false goals.[4] The coverage of the sales tax law is shaped by its own provisions and definitions and, where these are unclear, by applying its own perceived policies and concepts. (See Davis, *The Purposive Approach to the Interpretation of Sales Tax Statutes* (1966) 27 Ohio St.L.J. 429.)

Neither section 3617 of former Political Code nor its statutory successor, section 105, bears any designed relationship to the Sales and Use Tax Law. The former antedated the Retail Sales Tax Act of 1933 by many decades. Currently section 105 is found in that division of the Revenue and Taxation Code dealing with property taxation. Section 101 declares that such definitions govern in the construction of that division. We pointed out in *Standard Oil Co.* v. *State Bd. of Equal., supra,* 232 Cal.App.2d at pages 99-100, that the Legislature has not directed application of the ad valorem tax definitions to the field of sales taxation. The courts have often declared that definitions evolved for property tax purposes have no necessary conformity with definitions for other purposes. (*Trabue Pittman Corp.* v. *County of Los Angeles* (1946) 29 Cal.2d 385, 393 [175 P.2d 512], and cases cited.)

We do not stop to inquire into an interpretation which expanded a statutory reference to telephone and telegraph lines into one embracing electrical power lines for the purpose of property taxation. The statute interpreted by the Attorney General's 1936 opinion has no relevance here, because it

---

[3]Section 6016 provides: " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses."

[4]In *Standard Oil Co.* v. *State Bd. of Equal.,* 232 Cal.App.2d 91, 98 [42 Cal.Rptr. 543], we dealt with a somewhat parallel problem of sales taxation and quoted a comment which is pertinent here: " '. . . Terms such as "realty," "personalty" and "fixtures" should be recognized to be not only descriptions of fact but also convenient but confusing descriptions of the nature of legal relations between persons in various factual situations. The use of a mechanical fixtures test for all problems, or the statement of all issues in terms of whether or not a particular object has become a fixture or realty, whatever may be the nature of the underlying policy problem, should be recognized to lead to obscuring of the pertinent policy factors which should be considered in a particular case, thereby erecting a barrier to clear analysis.' "

The quoted statement is excerpted from Horowitz, *The Law of Fixtures in California, A Critical Analysis* (1952) 26 So.Cal.L.Rev. 21, 22.

is not imported into the scheme of sales taxation by any phase of the Sales and Use Tax Law. We have concluded that the present transaction is not a "sale" within the meaning of section 6006; rather that it is vulnerable to the sales tax only to the extent established by the criteria for construction contracts generally. In view of that conclusion, the administrative interpretation of the sales tax act stemming from the Attorney General's 1936 property tax opinion is incorrect. The rule giving weight to contemporaneous administrative construction is not evoked when the construction is incorrect. (*Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 599 [72 Cal.Rptr. 886, 446 P.2d 1006].)

The California sales tax law is a privilege tax measured by retailers' gross receipts from the sale of tangible personal property. (§ 6051.) Sales tax legislation of this kind excludes transactions which are primarily sales of services. (Due, State Sales Tax Administration (1963) p. 162; Oster, State Retail Sales Taxation (1957) pp. 6-7, 80, 86-91; Cohen, *The Taxable Transaction in Consumers' Sales* (1941) 8 Law & Contemp. Prob. 530, 530-537; Davis, *op. cit.,* 27 Ohio St.L.J. at pp. 453-454; Wahrhaftig, *Meaning of Retail Sales and Storage, Use or Other Consumption,* 8 Law & Contemp. Prob. 542, 555-557.) Where a service-supplying entrepreneur utilizes incidental, tangible material in his work, there is a tendency to regard him as a consumer and the sale to him as a retail sale. (Cohen, *op. cit.,* p. 531. Davis, *op. cit.,* p. 453. Wahrhaftig, *op. cit.,* p. 553.) Many transactions involve mixtures of materials and services, causing much difficulty in classifying them as taxable or excluded.

In defining a sale as a "transfer of title or possession . . . of tangible personal property for a consideration," section 6006 (fn. 2, *ante*) was designed to parallel the common law and the Commercial Code definitions of "sale." (*Select Base Materials* v. *Bd. of Equal.* (1959) 51 Cal.2d 640, 645-646 [335 P.2d 672].) A tangible article sold at retail is an amalgam of values created by material and services. The economic burden of the sales tax might be evaded by a consumer who furnished components to an entrepreneur who supplied nothing but services to fabricate these components into the desired end product. Subdivision (b) of section 6006 was designed to forestall that evasion.[5] Whether the retailer supplies the con-

---

[5]Referring to subdivision (b) of section 6006, an authoritative study declares: "This provision is essential to prevent the breaking down of the tax base by the device of buying raw materials from one source and having the finished product produced elsewhere, and to prevent a competitive disadvantage to those merchants who sell a finished product as against those who specialize in fabricating or processing." (Assem. Interim Com. Report No. 4, Revenue and Taxation, The Sales Tax (1964) p. 10.)

sumer with a completely fabricated article or only fabrication services, he delivers title or possession to the consumer and thus effects a "sale." (See, e.g., *Kamp* v. *Johnson* (1940) 15 Cal.2d 187 [99 P.2d 274]; *Overly Mfg. Co.* v. *State Board of Equal.* (1961) 191 Cal.App.2d 20 [12 Cal.Rptr. 391].)

In this case the taxpayer had title and possession only of the several components—wire, insulators and hardware. He did not fabricate these components into a composite article of merchandise, which he then "transferred" to the project owner. Rather he incorporated these components into a structure. Whether the structure became real or personal property in the hands of the project owner has no significance here because "we are not interested in the nature of the property in the hands of the buyer, but in its nature in the hands of the seller. . . ." (*Gen. Elec. Co.* v. *State Bd. of Equalization* (1952) 111 Cal.App.2d 180, 185 [244 P.2d 427].) Viewed as a seller, the contractor at no time had title or possession of a completed power line. The anti-evasion objective of the tax on "fabrication" is quite irrelevant here. When section 6006 is viewed in its own terms, the present transaction does not appear to have the statutory characteristics of a "sale."

Not only is the board's position inconsistent with section 6006; it is also inconsistent with its position vis-à-vis an entire range of business activities of essentially the same character as the present. A contractor building a power transmission line is engaged in an activity of the same basic sort as one constructing a dwelling house, an office building, a hydroelectric dam or a powerhouse. In the administration of the California sales tax law, the general rule views a building contractor as a supplier of services and as a consumer of the building material, who pays the sales tax to his supplier as and when he purchases the material. (*Levine* v. *State Board of Equalization* (1956) 142 Cal.App.2d 760, 768 [299 P.2d 738]; *Gen. Elec. Co.* v. *State Bd. of Equalization, supra,* 111 Cal.App.2d at p. 187.) In 1939 this view was crystallized in an administrative ruling of the State Board of Equalization. It was originally known as Ruling 11; it became section 1921 of title 18, California Administrative Code, when that code was established in 1945 and today appears as section 1521 of title 18. We shall refer to it as Rule 1521.

Rule 1521 defines a construction contract as one for creating *a building or other structure on land,* but not one for the sale and installation of machinery and equipment. It divides the personal property going into construction jobs into two categories: first, *materials,* that is, various kinds of tangible personal property which in combination lose their identity and become an

integral part of the completed structure; second, *fixtures,* which become an accessory to the building and do not lose their identity when placed or installed. In effect, Rule 1521 classifies the contractor as a consumer of *materials* who must pay a sales tax on his purchases; classifies him as a retailer of *fixtures,* who must charge his customer a tax measured by the retail selling price which, in the case of a lump sum contract, is the cost price of the fixture to the contractor.

Rule 1521 excludes from the tax base the price of the labor on the construction job. It was upheld as a reasonable and fair exercise of the administrative rule-making power in *Gen. Elec. Co.* v. *State Bd. of Equalization, supra,* 111 Cal.App.2d at pages 187-188. It distinctly rejects the notion (here embraced by the board) that this or any other construction project is a "sale" of the completed project within the meaning of section 6006.

The board posits no reason of statutory policy or economic reality which excludes this power line from the category of a "structure on land" within the scope of Rule 1521. Its position would saddle the owners of power line construction projects with an economic burden not borne by owners of other construction projects. By force of Rule 1521, the sales tax on construction materials is a direct obligation of the vendor who sells to the contractor; the vendor in turn is required by law to collect the tax from the contractor in the latter's role as consumer. (§§ 6051-6052.) (See *Western L. Co.* v. *State Bd. of Equalization* (1938) 11 Cal.2d 156, 162 [78 P.2d 731, 117 A.L.R. 838].) In terms of economic impact, Rule 1521 imposes upon the contractor the cost of the retail sales tax on *materials.* In practice, this cost is shifted to the project owner as part of the contract price. As to fixtures, the contractor (in his role as retailer) must pay the sales tax and collect it from the project owner. The contractor neither pays nor collects a sales tax measured by the cost of labor to incorporate *materials* into the structure or to install *fixtures.* The retail sales tax law ultimately imposes upon the project owner the dual economic burden created by the sales taxes on materials and fixtures going into the job, but not that of a tax base expanded by charges for construction labor and installation labor. The board would here expand the tax base by including in it the contractor's outlays for labor. The transaction in suit was nothing other than a contract for construction of a "structure on land" within the meaning of Rule 1521. Hence the contractor's labor charges were no part of the tax base.

█ Although King does not deny that a tax became payable on the price of the cable, insulators and hardware, he raises the bar of limitations as to a portion of his liability. Section 6487 establishes a three-year period

of limitations on deficiency assessments where the taxpayer files a return and an eight-year period where he does not. Part of the power line construction project was performed in 1959 and part in 1960. King received progress payments during both years. In August 1961 the board issued its assessment, designating the period in which the tax became due as the first six months of 1960. King sought a redetermination, which was denied. He then paid the assessed tax and in February 1963 filed a claim for refund. Sole ground of the claim was that the tax had been "erroneously and illegally" collected and computed. The present suit was filed in July 1963. In 1968, at the time of entering into the stipulation of facts with the Attorney General, King raised for the first time—at least so far as the record goes—a claim that part of the tax liability had been incurred in 1959 rather than 1960; that he had never been assessed for 1959 taxes; that the assessment issued by the board had named the "wrong period" for the tax; that the board was now barred by the eight-year statute from assessing him for the 1959 tax.

A refund claim must state the taxpayers' specific grounds. (§ 6904.) His refund action is confined to the grounds set forth in his claim. The refund claim thus frames and restricts the issues to be litigated. (*Richfield Oil Corp.* v. *State Bd. of Equalization* (1946) 329 U.S. 69, 73 [91 L.Ed. 80, 87, 67 S.Ct. 156].) The trial court held that King's refund claim was inadequate to raise the statute of limitations or the board's designation of the "wrong period." We agree. In legal proceedings generally the defense of limitations must be affirmatively pleaded, else it is waived. (3 Witkin, Cal. Procedure (2d ed. 1971) p. 2518.) A parallel requirement is voiced by the statutory demand for a statement of specific grounds for the claim of refund. The refund claim's assertion of "erroneously and illegally" collected and computed taxes was far too diffuse to meet this demand. The taxpayers' more pointed attempt to capitalize on the agency's asserted error is an apparent afterthought and comes too late.

■ King charges error in the trial court's ruling that he became liable to pay interest and a 10 percent penalty on that portion of the tax sustained by the court. He points out that in 1959 and thereafter he held good faith discussions and correspondence with the board concerning his liability. He alleges—although without any agreement on the board's part—that representatives of the board once told him that the transaction was not taxable except for the foundation materials; thus that the board is estopped from claiming penalty and interest.

Section 6452 requires taxpayers to file quarterly returns. Where a person fails to make a return, section 6511 directs the board to make a determination of the tax due and to add a 10 percent penalty. Contrary to the tax-

payer's contention, oral and written correspondence with the taxing agency is not tantamount to the tax return demanded by law. A taxpayer who in good faith contests his liability may file a return, pay the tax and present a claim for refund. (§§ 6901-6906.) If an overpayment is found, he may receive interest on it. (§§ 6907-6908.) If he chooses not to make a return, section 6511 requires the imposition of the 10 percent penalty.

██ As to the claim of estoppel, it is true that an estoppel may bar collection of penalty and interest, although not of taxes. (*Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 103 [290 P.2d 20].) According to the stipulated facts, if called as a witness King would testify that in bidding the transmission line job he relied upon oral representations by board officials that he would not be liable for a tax on the cable, insulators and hardware. The stipulation also noted the state's denial of such testimony. The trial court's findings declare that the alleged oral representations were insufficient to raise an estoppel. Indeed, the written documents incorporated by reference in the stipulation demonstrate irrefragably that as soon as the board discovered that the contract called for construction of an electrical transmission line, it consistently and stoutly maintained that the entire "sale" was taxable. The record does not support the claim of estoppel.

Judgment affirmed. The state will bear the costs of appeal.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied February 17, 1972, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied March 16, 1972.